UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIMINAL NO:  05-144 (DWF/JSM)

      Plaintiff,

v.                                           <u>REPORT AND RECOMMENDATION</u>

CLYDE SCOTT THOMPSON

      Defendant.

JANIE S. MAYERON, United States Magistrate Judge

The above matter came on before the undersigned upon defendant Clyde Scott Thompson's Motions (1) to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22], (2) to Suppress Statements, Admissions, and Answers [Docket No. 24], (3) to Dismiss Indictment Counts [Docket No. 26], and (4) to Dismiss for Statutory Speedy Trial Violation [Docket No. 29].[1]

Assistant United States Attorneys Lisa Biersay and Erika Mozangue appeared on behalf of the Government; Scott Tilsen appeared on behalf of defendant Clyde Scott Thompson, who was personally present.

---

[1]  Defendant Clyde Scott Thompson's Motions (1) to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant [Docket No. 19], (2) for Discovery [Docket No. 20], (3) for Exculpatory Evidence [Docket No. 21], and (4) for Order Directing Disclosure of Evidence Sought to be Admitted by the United States Under Rule 404(b) of the Federal Rules of Evidence [Docket No. 27], and the Government's Motion for Discovery Pursuant to Federal Rules of Criminal Procedure 16(b), 12.1, and 26.2 [Docket No. 18] are addressed in a separate Order of this Court.

Based upon the pleadings, testimony taken from Special Agents Christopher O'Leary and Wayne Kaufmann, exhibits submitted at the hearing, pre-hearing submissions, and post-hearing submissions, it is recommended that:

1.      Defendant Clyde Scott Thompson's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] be **DENIED.**

2.      Defendant Clyde Scott Thompson's Motion to Suppress Statements, Admissions, and Answers [Docket No. 24] be **DENIED.**

3.      Defendant Clyde Scott Thompson's Motion to Dismiss Indictment Counts [Docket No. 26] be **DENIED.**

4.      Defendant Clyde Scott Thompson's Motion to Dismiss for Statutory Speedy Trial Violation [Docket No. 29] be **DENIED.**

I.    **FACTUAL BACKGROUND**

FBI Special Agents Christopher O'Leary and Wayne Kaufmann testified at the hearing on pretrial motions that they were involved with the surveillance and arrest of defendant Clyde Scott Thompson.

Agent O'Leary testified that on April 1, 2005, he was in route to perform surveillance on Thompson's home in South St. Paul, Minnesota when he was notified that a bank robbery had occurred at a TCF National Bank. Agent O'Leary obtained a description of the vehicle used in the robbery getaway—a white Volkswagen and a partial license plate description of "NBX". Agent O'Leary knew that Thompson drove a white Volkswagen Golf with a black roof and license plate number NBX385, because he had done surveillance at 1518

Elrose Court, where Thompson resided with his girlfriend, and because on March 31, 2005, Agent O'Leary had watched Thompson all day.  Agent O'Leary went to 1518 Elrose Court and observed Thompson drive the white Volkswagen to the front of this location.

At that point, after matching the description and license plate of the vehicle at the site of the bank robbery with the vehicle driven by Thompson to 1518 Elrose Court, officers conducted a felony stop of the vehicle.  Agent O'Leary identified himself as an FBI agent, and told Thompson to place his hands outside the window and open the door from the outside.  Thompson stated that he could not open the door because it was broken.  Agent O'Leary then restrained Thompson's left hand and Special Agent Steve Simms restrained Thompson's right hand.  At that time, Agent O'Leary noticed what appeared to be dye pack stains on Thompson hands and smelled tear gas emanating from the vehicle.[2]

Agent O'Leary put Thompson on the ground and handcuffed him.  Agent O'Leary then performed a pat down search of Thompson.  During the pat down search, Agent O'Leary asked Thompson if he had any weapons or anything else on him, and Thompson replied that there was "a gun in the bag in the car." According to Agent O'Leary, his question was routine for officer safety.  An officer located the gun in the car, removed the rounds from the gun and placed it on the front passenger seat.  As Agent O'Leary continued the pat down, Agent O'Leary asked if Thompson had anything else on him that he should know about and Thompson replied that "he just had the gun."

---

[2]    According to Agent Kaufmann, the smell of tear gas was consistent with the presence of a dye pack going off.

After the car was cleared, Special Agent Salmon asked Thompson if he was hurt in any way because the dye pack had exploded. Thompson responded to the effect that "he knew how to handle those things." Thompson also commented that the officers must have been watching him because they were "on him quick" and stated that they had ruined his April Fool's Day or "guess April Fool's was on me."

Agent Kaufmann testified that he was the case agent for the Thompson case. On April 1, 2005, Agent Kaufmann received a call that a TCF Bank in South Minneapolis had been robbed and the assailant was described as a white male, driving a Rabbit or Golf Volkswagen with a black roof and partial license plate "NBX." Shortly after the initial call, he also heard that a dye pack had been deposited into the moneybag. Agent Kaufmann arrived on the scene of the arrest approximately one half hour after Thompson's arrest.

Agent Kaufmann transported Thompson to the United States Courthouse in St. Paul, Minnesota where he was placed in the FBI prisoner processing room. Agent Kaufmann entered the processing room to talk to Thompson. Agent Kaufmann asked Thompson if he wanted to talk and Thompson replied, "Not really." Agent Kaufmann testified that he did not understand Thompson's response to be a clear statement that Thompson did not want to talk; rather he interpreted Thompson's answer to mean that he had not decided whether or not to talk to Agent Kaufmann. Agent Kaufmann, to clarify Thompson's statement, told Thompson that he did not have to talk, that he had a constitutional right not to talk and that his statements could be used against him. Agent Kaufman then

started to read to Thompson from his Advice of Rights card. Gov't Ex. 5. Specifically, Agent Kaufmann testified that he read the first two lines of the card, which state, "Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court." At that point, Thompson raised his hand so as to gesture for Kaufmann to stop reading the card, and said, "I know what my rights are. I've heard them many times."

Agent Kaufmann informed Thompson that he did not need to talk because the Government had a very strong case against him, including finding in the car the loaded gun, dye pack stains, dye pack stained money, and a police scanner, and told him that he was done. Thompson then began to explain to Agent Kaufmann why he had a loaded gun, the process he had to remove dye stains from money, that he was saving the seven rounds found in the gun for the officers, and that he was taking target practice in order to shoot officers in the head because they wear protective vests. Agent Kaufmann told Thompson that he was a rare bank robber, in that Thompson had a 1970s style to his bank robberies and that Thompson had changed his modus operandi. Thompson told Agent Kaufmann that he had a good group of guys working with him on the bank robberies, but that when Thompson told them to shoot any FBI agents or cops they saw, they could not stomach that, so he went solo. Thompson commented that he hoped he would be recognized for his bank robberies and that he thought that he would get coverage like the "Fishing Hat Bandit." Agent Kaufmann testified that he interpreted Thompson's statements as indicating that Thompson

wanted to talk. Agent Kaufmann also testified that Thompson appeared to be boastful and proud of his robberies.

During this conversation, Thompson never requested an attorney and never said he did not want to talk.  Agent Kaufman did not threaten Thompson; he did not promise Thompson anything; he did not tell Thompson that their conversation was off the record; he did not tell Thompson that he was not taping the conversation; and he did not tell Thompson that he was not going to ask him to sign a waiver of rights card.

After Thompson's initial appearance, while Thompson was in the processing room at the United States Marshal's Office, Thompson asked Agent Kaufman who the confidential informant was in the case.  Thompson then stated: "If it was Brian, tell him that I will get out of prison again."

II.    **DISCUSSION**

   A.    **Motion to Suppress Evidence Obtained as a Result of Search and Seizure based on the Four Corners of the Three Search Warrant Affidavits**

There are three warrants in dispute.   The first warrant focused on the premises located at 1518 Elrose Court Unit #1, South St. Paul, MN.  The second warrant focused on a white Volkswagen Golf automobile, license plate number NBX358.  The third warrant focused on the premises located at 2118 Marshall Ave., St. Paul, MN.  At the hearing on the pretrial motions, the parties stipulated that Thompson's motion to suppress evidence obtained from the three search warrants should be decided solely based on the four corners of the search warrant applications.   As such, the only issue presented to the Court in

connection with Thompson's motion is whether probable cause existed on the face of each of the search warrant applications.

The facts underlying the present motion are as follows: During the course of the investigation of defendant, FBI Special Agent Dave Rapp applied for a search warrant of the residence located at 1518 Elrose Court Unit #1, South St. Paul, MN and detached garage #5 (Gov't Ex. 3, "Elrose Court search warrant"), and the white Volkwagen Golf automobile, license plate number NBX 358 (Gov't Ex. 4, "Golf vehicle search warrant"). FBI Special Agent Wayne Kaufmann applied for a search warrant of the residence located at 2118 Marshall Ave., St. Paul, MN (Gov't Ex. 2, "Marshall Avenue search warrant").

All three of the search warrant applications described the property sought by their respective warrants as follows:

> Handguns, U.S. Currency, Bait bills, Vehicle Registration, Dark Sweatshirts, White T-shirts, Blue Jeans, Tennis Shoes, Masks/Facial disg, Bandannas (various colors), Red Sweatshirts, Baggy Shorts, Dark Shoes, Dark colored gloves, Blue or dark colored nylon bag, Orange sunglasses, Black knit gloves, Dark colored baseball cap, Gray hooded sweatshirt with white letters "PEPSI," rubber gloves, Dark pullover windbreaker with a zippered collar, Dark colored rubber gloves, Brown boots, Khaki and/or blue canvass shopping bag or gym bag, "Vans" shoes, Hair dye/coloring, Green Jacket, Tan/Khaki colored pants (Cargo Style and Regular Style), Black rimmed glasses, Dark colored long barreled handgun, Facial Putty/makeup disguise materials, Green Bay Packers baseball hat, green shirt, brown shoes, Spongebob Square Pants Gift Bag, Dark colored baseball hat, White Jacket with Red Stripe across back, Tan baseball hat with blue bill, Navy blue zip up jacket, Red/purple plaid shirt, Dark colored gloves, Lighter colored glasses, Blue button up shirt, Creme/white canvass or cloth bag with handles, Tan

> Nike baseball hat, Red zip up jacket, Creme colored bag with blue straps, Green jacket with brown collar, Fake/Rubber material nose, Clear/see through mask, Clear/See through mask with facial hair molded or drawn on, Blue Timberwolves baseball hat, Black jacket, Red button down shirt with white logo, Blue plaid jacket or shirt, Hooded grey sweatshirt, Dark baseball hat with a logo

Gov't Exs. 2, 3 and 4.  In addition, the Elrose Court and Golf vehicle search warrants sought a "Dark colored jacket with a lighter colored stripe" and the Golf vehicle warrant sought "Dye Pack."  Gov't Exs. 3 and 4.

The relevant portion of Special Agent Rapp's affidavits, accompanying the Elrose Court and Golf vehicle search warrants, described the basis for the warrant as follows:

> 2.     On Friday, March 25, 2005, your affiant met with a confidential source.  This confidential source advised that he/she had seen recent surveillance photographs in the Stillwater Gazette of a serial bank robber nicknamed "The Spongebob Bandit."  These surveillance photographs were of the march 18, 2005 bank robbery that occurred at the TCF National Bank, Cub Foods, 1801 Market Drive, Stillwater, Minnesota.  In this robbery, the bank robber was described as a white male, 5'7" in height, with a slight goatee and lighter colored hair.  The robber was wearing a green jacket, tan colored pants, and black rimmed glasses.  The robber was carrying a dark colored, long barreled hand gun.  This source advised that he/she is positive that this individual depicted in these surveillance photographs is CLYDE THOMPSON.
>
> 3.     This source advised that CLYDE THOMPSON has been dying his hair and facial hair a darker color to make himself look younger in an attempt to disguise himself.  The source believed that CLYDE THOMPSON may also be putting cosmetics or putty type material on his face to additionally hide his identity.   The source believed that CLYDE THOMPSON was robbing banks in an effort to obtain

money for his girlfriend Krystal Larson's methamphetamine addiction.

4.     The confidential source advised that CLYDE SCOTT THOMPSON resides with his girlfriend Larson at 1518 Elrose Court Unit #1, South St. Paul, Minnesota. CLYDE THOMPSON has been observed on several occasions coming and going from this residence. CLYDE THOMPSON was most recently observed leaving and later returning to this residence on Wednesday, March 30, 2005.

5.     This source then looked at additional bank robbery surveillance photographs of February 2, 2005 bank robbery that occurred at the TCF National Bank, Cub Foods, 1729 Market Boulevard, Hastings, Minnesota.  The robber was described as a white male, approximately 40 years of age, 5'8" in height, 150 pounds, with short brown hair, a dark mustache, and with ruddy complexion.  The robber was wearing a Green Bay Packers baseball cap, a green jacket, a green shirt, tan pants, and brown shoes.  The robber was carrying a dark colored, long barreled hand gun and a Spongebob Square Pants gift bag.  The source identified the robber in these bank surveillance photographs as being CLYDE THOMPSON.

6.     The "Spongebob Bandit" is also suspected of committing a numerous of other bank robberies, including [lists 9 different bank robberies of TCF banks at Cub Foods by date and location]

7.     On Friday, April 1, 2005, at approximately 11:45 a.m., the 'Spongebob Bandit" robbed the TCF National Bank, 5937 Nicollet Avenue, Minneapolis, Minnesota.  The robber was described as a white male, with grayish facial hair.  The subject was wearing black dark framed glasses, a dark colored hat and a darker colored jacket with a lighter colored stripe.  The robber received a dye pack and bait bills, and departed the Cub Foods Store.  A witness in a nearby apartment complex noticed the robber get into a while colored Volkswagen modeled vehicle.  The witness also recorded the first three letters of the license plate as NBX.

8.     Surveillance units at the vicinity of Inver Grove Heights, Minnesota were notified of the robbery and alerted to the vehicle description.  At approximately 12:05 p.m. surveillance units noticed that CLYDE THOMPSON'S vehicle was not parked at his home.

Surveillance units then spotted CLYDE THOMPSON driving his white Volkswagen Golf with license plate NBX 385 on Upper 55th Street in Inver Grove Heights, Minnesota. At approximately 12:10 p.m. CLYDE THOMPSON parked this vehicle in front of his home at 1518 Elrose Court. At this time, FBI Agents ordered CLYDE THOMPSON to put his hands out the window of the vehicle. FBI Agents noticed red dye stain on CLYDE THOMPSON's hands. At this point, CLYDE THOMPSON was arrested under probable cause for bank robbery. Upon exiting the vehicle, CLYDE THOMPSON was asked if he had any weapons. CLYDE THOMPSON stated "the gun is in the bag", referring to a bag in the car.

9.     Located within the car was a dark colored baseball cap on the passenger front seat, a darker colored jacket with a lighter colored stripe was located on the driver's seat, a pair of black plastic framed sunglasses was located on the passenger front seat, and a white handled bag with red dye stains was located inside a paper shopping bag on the front seat passenger side floorboard.

10.    Additionally, FBI Agents located a camouflage backpack in a brown bag located on the passenger side floorboard. Inside this camouflage backpack was a loaded Taurus .357 magnum revolver. Also located in the camouflage backpack was a black Walther PPK air gun.

11.    You affiant has reviewed driver's license information regarding CLYDE SCOTT THOMPSON. CLYDE THOMPSON is listed as being 5'7" in height, 150 pounds in weight, with brown eyes. CLYDE THOMPSON's date of birth is July 29, 1959.

Gov't Exs. 3-4.

On April 1, 2005, the search warrants for Elrose Court and the Golf vehicle were issued by United States District Court Magistrate Judge Janie S. Mayeron and were executed by Special Agent Dave Rapp. Among other evidence, Special Agent Rapp found in the search of the Elrose Court location clothing, sunglasses, one makeup applicator, one small white bag with purple handles, a

police call directory, a maroon and a gray backpack containing a rubber mask.

Among other evidence, Special Agent Rapp found in the search of the Golf

vehicle clothing, a dye stained white cloth, a backpack and holster, black-framed

small sunglasses, one opened box of latex exam gloves, a Taurus .357 revolver

with 7 rounds, serial number VD937716, and a Crosman air pistol.

The relevant portion of Special Agent Kaufman's affidavit, accompanying

the Marshall Avenue search warrant, described the basis for the warrant as

follows:

> 3.      On Friday, March 25, 2005, your affiant
> received information from a confidential source
> (hereinafter, "CS,") regarding the March 18, 2005
> bank robbery of the TCF National Bank, Cub Foods,
> 1801 Market Drive, Stillwater, Minnesota, a federally
> insured banking institution.  The CS had seen recent
> surveillance photographs of a serial bank robber,
> nicknamed "The Spongebob Bandit," in the Stillwater
> Gazette newspaper.   The lone bank robber in the
> March 18, 2005 bank robbery of the TCF National
> Bank was described as a white male, 5'7" in height,
> with a slight goatee and lighter colored hair.   The
> surveillance photographs depicted the robber wearing
> a green jacket, tan-colored pants, and black-rimmed
> glasses; and carrying a dark-colored, long-barreled
> hand gun.  The CS was positive that this individual
> depicted in these surveillance photographs is CLYDE
> THOMPSON.
> 4.      The "Spongebob Bandit" is also suspected of
> committing numerous other bank robberies, including
> [lists 10 different bank robberies of TCF banks at Cub
> Foods by date and location]
> 5.      Each of the bank robberies itemized above in
> paragraph 4 had a similar *modus operandi* to the
> March 18, 2005 TCF bank robbery for which the CS
> reviewed surveillance photographs.   Additionally, the
> physical description of the bank robber of the March
> 18, 2005 TCF is consistent with the bank robbery
> suspect detailed in paragraph 4.

6.      On Friday, April 1, 2005, at approximately 11:45 a.m., the TCF National Bank, located in a Cub Foods Store at 5937 Nicollet Avenue, Minneapolis, Minnesota was robbed.  The robber was described as a white male, with grayish facial hair.  The robber wore black dark-framed glasses, a dark-colored hat and a darker colored jacket with a lighter colored stripe.  The victim teller gave the robber a dye pack and bait bills.  A witness in a nearby apartment complex noticed the robber get into a white Volkswagen modeled vehicle.  The witness also recorded the first three letters of the license plate as "NBX."

7.      Surveillance units then spotted CLYDE THOMPSON driving his White Volkswagen Golf with license plate NBX 385 on Upper 55th Street in Inver Grove Heights, Minnesota.  At approximately 12:10 p.m., CLYDE THOMPSON parked this car in front on his girlfriend's residence at 1518 Elrose Court Unit #1, South St. Paul, Minnesota.  At this time, FBI Agents ordered CLYDE THOMPSON to put his hands out the window of the car.  FBI Agents noticed red dye stains on CLYDE THOMPSON's hands.

8.      CLYDE THOMPSON told Agents there was a gun in the car.  FBI Agents located a loaded Taurus .357 magnum revolver and rendered it safe.

9.      On April 1, 2005, federal magistrate judge Janie S. Mayeron issued a complaint and arrest warrant for CLYDE THOMPSON, and a search warrant for his girlfriend's residence at 1518 Elrose Court Unit #1, South St. Paul, Minnesota.

10.     Located within the car was a dark-colored baseball cap on the passenger front seat, a darker colored jacket with a lighter colored stripe on the driver's seat, a pair of black plastic framed sunglasses on the passenger front seat, and a white-handled bag with red dye stains inside a paper shopping bag on the front passenger side floorboard.

11.     During the execution the search warrant of the residence of CLYDE THOMPSON's girlfriend at 1518 Elrose Court Unit #1, South St. Paul, Minnesota, his girlfriend told FBI agents that they would not find anything in her residence because CLYDE THOMPSON kept all his belongings at 2118 Marshall Avenue, St. Paul, Minnesota.

> This address is also listed on his drivers license and is also the address he provided to his Federal Parole Officer.

Gov't Ex. 2.

On April 4, 2005, the Marshall Avenue search warrant was issued by United States District Court Magistrate Judge Janie S. Mayeron and was executed by Special Agent Wayne Kaufmann. Among other evidence, Special Agent Kaufmann found clothing (baseball hat, blue denim long sleeve shirt, green and blue plaid long sleeve shirt), plastic clear-framed eyeglasses, hair dye, and a box of mask-making materials in the search of the Marshall location.

Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. Illinois v. Gates, 462 U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000).

The task of a court issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. In reviewing this decision of the issuing court, the duty of the reviewing court is simply to ensure that the issuing court had a substantial basis for concluding that probable

cause existed. Id. at 238-39 (citation omitted). However, "[u]nder the Fourth Amendment, law enforcement officers may not obtain a search warrant through statements which are intentionally or recklessly false." United States v. Hollis, 245 F.3d 671, 673 (8th Cir. 2001) (citation omitted).

### 1.    The Elrose Court and Golf Vehicle Search Warrants

In this case, the contents of the Elrose Court and Golf vehicle search warrant applications and supporting affidavits provided probable cause for the search of the residence located at 1518 Elrose Court and detached garage #5 and the white Volkswagen Golf automobile, license plate number NBX358. The search warrant applications' affidavits state that a confidential source ("CS") notified law enforcement that he/she had seen surveillance photographs of "The Spongebob Bandit" in the Stillwater Gazette and was certain that the person in the surveillance was Thompson. The CS informed law enforcement that Thompson lives with his girlfriend, Krystal Larson, at 1518 Elrose Court Unit #1, South St. Paul, Minnesota, and law enforcement had observed Thompson leaving and returning to this residence several times—most recently on March 30, 2005. Further, the CS looked at additional bank robbery surveillance photographs of the February 2, 2005 bank robbery of a TCF National Bank, Cub Foods, in Hastings, Minnesota, and identified the robber as Thompson. Additionally, law enforcement had reviewed Thompson's driver's license information, which matched the age, height and weight of the description obtained from the CS.

On April 1, 2005, at approximately 11:45 a.m., the TCF National Bank in South Minneapolis was robbed. The robber was described as a white male, with grayish facial hair and wore black dark framed glasses, a dark colored hat and a darker colored jacket with a lighter colored stripe. The robber received a dye pack and bait bills. A witness in a nearby apartment complex observed the robber get into a white colored Volkswagen and recorded the first three letters of the license's plate as "NBX". Surveillance units in the Inver Grove Heights area were notified about the robbery and told the vehicle description. Shortly after, Thompson parked his car in front of 1518 Elrose Court. Once Thompson parked, the agents ordered him to put his hands out the window, at which time the agents noticed the red dye stains on Thompson's hands. Inside the car, the agents saw several items (a dark colored baseball cap, a darker colored jacked with a lighter colored stripe, a pair of black plastic framed sunglasses, and a white handled bag with red dye stains), which matched the description of the robber's clothing and the results of an exploded dye pack. The agents subsequently found in Thompson's car a loaded Taurus .357 magnum revolver and a black Walther PPK air gun.

Given all of this information, a reasonable person could conclude that there was evidence of a crime located at the 1518 Elrose Court residence and detached garage #5 and in the white Volkwagen Golf automobile, license plate number NBX358 observed leaving the scene of the robbery and arriving at Elrose Court. The affidavits set forth facts establishing bank robbing activities, tied them to Thompson and connected Thompson to the Elrose Court residence

and the Golf vehicle. Therefore, based upon the totality of the circumstances, this Court finds that substantial evidence existed to support the finding of probable cause to issue the search warrant for the items described at the location of 1518 Elrose Court Unit #1, South St. Paul, MN and detached garage #5 and in the white Volkwagen Golf automobile, license plate number NBX358.

### 2. The Marshall Avenue Search Warrant

The contents of the Marshall Avenue search warrant application and supporting affidavit also provided probable cause for the search of the residence located at 2118 Marshall Avenue, St. Paul, Minnesota. This is the address listed on Thompson's driver's license and the address he provide to his Federal Parole Officer. In addition to the information provided in the Elrose Court and Golf vehicle search warrants, the Marshall warrant stated that during the execution of the warrant on the residence of Thompson's girlfriend at 1518 Elrose Court, Thompson's girlfriend told FBI agents that they would not find anything in her residence because Thompson kept all his belongings at 2118 Marshall Avenue, St. Paul, Minnesota.

Given this information, a reasonable person could conclude that there was evidence of a crime at 2118 Marshall Avenue, St. Paul, Minnesota. Like the other two search warrants, the affidavit sets forth facts establishing Thompson's bank robbing scheme and tied Thompson to the Marshall Avenue residence. Therefore, based upon the totality of the circumstances, this Court finds that substantial evidence existed to support the finding of probable cause to issue the

search warrant for the items described at the location of 2118 Marshall Avenue, St. Paul, Minnesota.

For all of the reasons stated above, this Court recommends that Thompson's motion to suppress evidence obtained from the search warrants of Elrose Court, the Golf vehicle and Marshall Avenue be denied.

### B.    Motion to Suppress Statements, Admissions, and Answers

Thompson has brought a motion to suppress statements to the officers. Thompson argued that his statements should be suppressed on grounds that they were obtained without the required Miranda warning.

In order to decide whether any of the statements made by Thompson should be suppressed, this Court must determine whether Thompson was (1) in custody, and (2) being interrogated. See United States v. Hatten, 68 F.3d 257, 261 (8th Cir. 1995) (finding the protections afforded by Miranda are only triggered when an individual "is both in custody and being interrogated") (citation omitted).

### 1.    The Law Under Miranda

### a.    Custody

Under Miranda, an individual must be advised of his or her right to be free from compulsory self-incrimination and the right to the assistance of an attorney any time the individual is taken into custody for questioning. Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990); see also Hatten, 68 F.3d at 261 (holding that "[t]he protections afforded by Miranda are only triggered when an individual 'is both in custody and being interrogated'").  "Custody occurs either upon formal arrest or under any other

circumstances where the suspect is deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444.

When determining whether a suspect is in custody, courts consider the following six "indicia of custody":

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during the questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere of the questioning was police dominated; and
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

Griffin, 922 F.2d at 1349; see also United States v. Axsom, 289 F.3d 496 (8th Cir. 2002). The first three factors are considered "mitigating factors" which, if found, tend to show that the suspect was not in custody. Griffin, 922 F.2d at 1349. The remaining three factors are characterized as "coercive factors" which, if found, tend to show the existence of custody. Griffin, 922 F.2d at 1349.

The determination of whether an individual is in custody at a particular time depends on "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the

18

suspect's position would have understood his situation' to be one of custody."
Griffin, 922 F.2d at 1347 (quoting Berkemer v. McCarty, 468 U.S. 420, 442
(1984)).

### b.    Interrogation

"Interrogation" means "questioning initiated by law enforcement officers."
Miranda, 384 U.S. at 444.   The test for determining whether questioning is
"interrogation" within the meaning of Miranda, is whether, under all of the
circumstances involved in a given case, questions are reasonably likely to elicit
an incriminating response from the suspect.  See Rhode Island v. Innis, 446 U.S.
291, 300-01 (1980).  One factor considered by courts is whether the officers are
aware of the potentially incriminatory nature of the disclosures sought.  See
Garner v. United States, 424 U.S. 648, 657 (1976); see also United States v.
Morales, 834 F.2d 35, 38 (2d Cir. 1987);  United States v. Salgado, 292 F.3d
1169, 1173 (9th Cir. 2002).

However, not all statements made while in custody are the products of
interrogation.  See Innis, 446 U.S. at 299.

> Statements volunteered by a suspect during the
> course of routine arrest procedures were not the
> products of interrogation, and that custodial
> statements made on the suspect's own initiative are
> not subject to the safeguards of Miranda.  Miranda
> does not protect an accused "from a spontaneous
> admission made under circumstances not induced by
> the investigating officers or during a conversation not
> initiated by the officers."

United States v. Cotton, 223 F.Supp.2d 1039, 1048 (D. Neb. 2002) (quoting
Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (internal citations omitted)).

Initiation occurs by a defendant occurs when the defendant evinces "a willingness and a desire for a generalized discussion about the investigation." Holman v. Kemna, 212 F.3d 413, 417 (8th Cir. 2000).

Further, the Supreme Court has held that "there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved." New York v. Quarles, 467 U.S. 649, 655-56 (1984). Thus, Miranda warnings need not be administered before officers ask questions "reasonably prompted by a concern for the public safety." Id. at 656. This exception has been applied by the Eighth Circuit. See, e.g., United States v. Williams, 181 F.3d 945 (8th Cir. 1999)(applying the public safety exception to allow statement that a gun was in the closet because officers could not have known if armed individuals were present in or preparing to enter the apartment, or if other hazardous weapons might be present).

### 2. Thompson's Motion to Suppress His Statements

Thompson has moved this Court for an order suppressing the oral statements made by him on April 1, 2005 to Special Agents O'Leary, Kaufmann, and Salmon on grounds that he was not read his Miranda rights prior to making these statements.

### a. Thompson's Statements to Agent O'Leary

Thompson made statements to Agent O'Leary at two different times. The first occasion occurred as Agent O'Leary performed a pat down of Thompson, at

which time Agent O'Leary asked Thompson if he had any weapons on him. In response to Agent O'Leary's question, Thompson stated "that there was a gun in the bag in the car." As Agent O'Leary continued Thompson's pat down, he asked if Thompson had anything else that he should know about and Thompson replied "no, just the gun."

Thompson argued that he was improperly interrogated about weapons in his possession before he was read his Miranda rights, and that consequently, his statements regarding the gun in his car should be suppressed. In opposition, the Government argued that Thompson was questioned about weapons for officer safety. Specifically, the Government contends that Thompson's statements were prompted by concerns for public safety.

As a preliminary matter, the Court finds that while no strong arm tactics or deceptive strategies were used by Agent O'Leary in connection with their conversation, under the remaining factors set forth in Griffin, Thompson was in custody when he spoke to Agent O'Leary.

The next issue is whether Agent O'Leary's questioning of Thompson constituted an interrogation such that a Miranda warning was required, or whether an exception to Miranda applies to this situation. Agent O'Leary testified that at the time that he asked Thompson if he had any weapons on him, Thompson was on the ground, handcuffed, and being patted down. Agent O'Leary testified that he asked this question to protect officer safety. This Court concludes that it is reasonable for an officer who is patting down a bank robbery suspect to ask if he has any weapons on him. See e.g., Quarles, 467 U.S. at

652, 655-56 (permitting officer to ask where the gun was located after suspect had been handcuffed for public safety); Williams, 181 F.3d at 953-54 (permitting officer to ask if he needed to be aware of anything else after suspect had been handcuffed for public safety).  Consequently, while Thompson was in custody at the time he answered Agent O'Leary's questions about weapons, the questions directed to Thompson—for the purpose of ensuring the safety of the officers— constituted an exception to the Miranda rule requiring that a suspect be advised of his or her rights prior to questioning.  Accordingly, Thompson's statements in response to Agent O'Leary's questions should not be suppressed and should be used in the Government's case in chief.

### b.    Thompson' Statements to Special Agent Salmon

After Thompson had been patted down, Special Agent Salmon asked Thompson if he was hurt in any way, referring to the dye pack that had gone off. Thompson responded that he knew how to handle those things.  Thompson also commented that the officers must have been watching him because they were "on him quick" and stated that they had ruined his April Fool's Day or "guess April Fool's was on me."

First, this Court concludes that Special Agent Salmon's inquiry of Thompson if he was hurt did not amount to an interrogation such that a Miranda warning was required.  That is, in this situation, asking a criminal suspect about his health or possible injuries is not reasonably likely to elicit an incriminating response.  Cf. Rhode Island v. Innis, 446 U.S. 291, 301-302 (1980)("[S]ince the police surely cannot be held accountable for the unforeseeable results of their

words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response."). Therefore, Thompson's response that he knew how to handle dye packs should not be suppressed because the officer had no way of knowing that asking a question about Thompson's health would lead to such a statement.

Second, Thompson's statements to Special Agent Salmon regarding the speed by which the officers found him and April Fools Day, while constituting custodial statements, were made on Thompson's own initiative, and therefore, are not subject to the safeguards of Miranda. Miranda does not protect an accused "from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers." Cotton, 223 F.Supp.2d at 1048 (quoting Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989) (internal citations omitted)). Here, there is nothing in the record to suggest that Special Agent Salmon did anything to induce those statements. Rather, based on the testimony of Agent O'Leary, this Court concludes that Thompson's statements to Special Agent Salmon evinced "a willingness and a desire [by the suspect] for a generalized discussion about the investigation." Holman, 212 F.3d at 417.

For all of these reasons, this Court recommends that Thompson's motion to suppress his statements to Special Agent Salmon should be denied.

### c.   Thompson's Statements to Agent Kaufmann

Thompson also challenges the statements he made to Agent Kaufmann in the FBI processing room in the St. Paul federal courthouse.   Agent Kaufmann asked Thompson if he wanted to talk and Thompson replied, "Not really."   Agent Kaufmann then informed Thompson of his constitutional right not to speak and began to read from his Advice of Rights card.   After being informed of his right to remain silent and that his statements could be used against him in court, Thompson gestured to Agent Kaufmann to stop and told Agent Kaufmann that he knew what his rights were and that he had heard them many times. In response, Agent Kaufmann informed Thompson that he did not need to talk because the Government had a very strong case against him, and proceeded to lay out the evidence.   Thompson then made several incriminating statements to Agent Kaufmann. Agent Kaufmann testified that Thompson appeared to be boastful and proud of his activities.

During this conversation, Thompson never requested an attorney and never said he did not want to talk.  Agent Kaufman did not threaten Thompson or make any promises to him.

After Thompson's initial appearance, Thompson asked Agent Kaufmann who the confidential informant was in the case.  Thompson then stated "that if it was Brian, tell him that I will get out of prison again."

Thompson argued that his statements to Agent Kaufmann in the processing room should be suppressed because the only reasonable interpretation of Thompson's answer of "not really" to Agent Kaufmann's question

about Thompson's desire to talk to Agent Kaufmann, is "no." Thompson further argued that if his answer was ambiguous, a partial <u>Miranda</u> warning is not sufficient to render his subsequent statements admissible.[3]

In response, the Government argued that Thompson's statement of "not really" was ambiguous, that he understood his <u>Miranda</u> rights, and thus, his subsequent conversation with Agent Kaufmann constituted a waiver of <u>Miranda</u>. The Government further argued that even if there was a violation of <u>Miranda</u>, Thompson's statements were voluntary and therefore, <u>Miranda</u> does not require their suppression.

Under <u>Miranda</u>, an individual must be advised of his right to be free from compulsory self-incrimination and the right to the assistance of an attorney anytime the individual is taken into custody for questioning. <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>see</u> <u>also</u> <u>United States v. Griffin</u>, 922 F.2d 1343, 1347 (8th Cir. 1990). If a person in custody has invoked his right to remain silent, law enforcement officers must scrupulously honor his assertion of that right. <u>See</u> <u>Simmons v. Bowersox</u>, 235 F. 3d 1124, 1131 (8th Cir. 2000). However, to invoke one's right to remain silent, one must unequivocally express his desire to remain silent; an assertion of one's <u>Miranda</u> rights must be neither ambiguous nor equivocal. <u>Id.</u> (citations omitted) To determine whether a defendant has unequivocally invoked the right to remain silent, the defendant's statements are

---

[3]    Thompson did not address Thompson's comments to Agent Kaufmann about "Brian." However, even if he did challenge the comments, this Court concludes that they constituted a spontaneous admission made without inducement or were part of a conversation initiated by Thompson. As such, the comments are not the product of an interrogation and should not be suppressed.

considered as a whole.  Id. (citing United States v. Johnson, 56 F.3d 947, 955 (8th Cir.1995)).

In this case, before Agent Kaufmann began to read Thompson his Miranda rights, he asked Thompson if he wanted to talk and Thompson said "not really."  As an initial matter, this Court finds that Thompson's statement of "not really" in response to Agent Kaufmann's inquiry about his willingness to talk, does not amount to a clear and unequivocal expression by Thompson that he wished to remain silent.  United States v. Thompson, 866 F.2d 268, 272 (8th Cir.1989)("To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'").  "Not really," does not indicate a clear and unequivocal desire to remain silent.

However, even if Thompson had invoked his right to remain silent with his response of "not really," this Court must still address whether Thompson's conduct and words after Agent Kaufmann began to read Thompson his rights, constituted a valid waiver of his Miranda rights.

The validity of a Miranda waiver has "'two distinct dimensions'--whether the waiver is voluntary and whether it is knowing and intelligent."  United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (quoting Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).  "In determining whether a valid waiver has been made, a trial court must look at the totality of the circumstances in each case, including the background, experience, and conduct of the accused."  United States v.

26

Barahona, 990 F.2d 412, 418 (8th Cir. 1993) (citing United States v. Dougherty, 810 F.2d 763, 773 (8th Cir. 1987); Stumes v. Solem, 752 F.2d 317, 320 (8th Cir. 1985), cert. denied, 471 U.S. 1067 (1985)) (citation omitted).

In terms of whether a waiver of Miranda was voluntary, "[t]he proper inquiry is whether the Miranda waiver 'was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" Perry v. Kemna, 356 F.3d 880, 886 (8th Cir. 2004) (quoting Moran, 475 U.S. at 421; Turner, 157 F.3d at 555).

In order for a Miranda waiver to be "knowing and intelligent," the "waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Turner, 157 F.3d at 555 (citing United States v. Jones, 23 F.3d 1307, 1313 (8th Cir. 1994); Moran, 475 U.S. at 421); see also Perry, 356 F.3d at 887 (A valid Miranda waiver "'must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'") (quoting Moran, 475 U.S. at 421).

The Supreme Court has found that an explicit statement of waiver is not necessary to support a finding that a defendant waived the right to remain silent or the right to counsel guaranteed by Miranda. See North Carolina v. Butler, 441 U.S. 369, 373 (1979). Further, the Eighth Circuit has held that the Supreme Court in Butler rejected the proposition that a defendant must explicitly waive his Miranda rights before a confession is admissible, and also found that "waiver may be inferred from the fact that [a] defendant responded to questions being

posed by the interviewer after being advised of his rights."  United States v. House, 939 F.2d 659, 662 (8th Cir. 1991) (citation omitted).

While this Court was unable to find any authority within the Eighth Circuit which addressed the facts presented here—i.e. a suspect interrupts the reading of the Miranda warning, stating he is aware of his rights, and then proceeds to make incriminating statements—this Court finds two cases from the Ninth and Sixth Circuits, to be instructive.  In United States v. Pheaster, 544 F.2d 353, 365 (9th Cir. 1976), Pheaster, who had been arrested for his involvement in a kidnapping, was in the process of being read his Miranda rights, when he interrupted the agent, insisted that he knew his rights and demanded to see an attorney.  Id. at 364-65.  The agent completed the Miranda warning, and Pheaster was told he would be provided an attorney following his booking at the county jail.  Id. at 365.  As Pheaster was being transported to the jail, the officer engaged him in a one-way conversation about the evidence against him, at which point Pheaster made some incriminating statements regarding his involvement in the kidnapping.  Id. After discussing cases from the Fifth Circuit[4], Ninth Circuit[5] and the Supreme Court[6], the court concluded that in appropriate circumstances a waiver of Miranda rights can be implied rather than express, and that under these facts, Pheaster had impliedly waived his Miranda rights.  Id. at 366-68.  Similarly, in United States v. Jones, 128 Fed.Appx. 490, 2005 WL

---

[4]     United States v. Hodge, 487 F. 2d 945 (5th Cir. 1973).

[5]     United States v. Davis, 527 F.2d 1110 (9th Cir. 1975).

[6]     Michigan v. Mosley, 423 U.S. 86 (1975).

900870, at *4 (6th Cir. Apr. 19, 2005), the court found that the defendant's incriminating statements, made after he interrupted an officer from completing the reading of the <u>Miranda</u> warning, were voluntary. In reaching this decision, the court stated:

> Furthermore, even if Jones was in custody at the time he gave these statements, and he had not previously been advised of his <u>Miranda</u> rights, his statements are nonetheless admissible because they were volunteered. "'Interrogation' ... must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Statements given freely and voluntarily are admissible whether or not a defendant has been informed of his rights. <u>See</u> <u>Miranda</u>, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."). The record supports the district court's conclusion that the officers were not interrogating Jones when he made those statements, and that they even attempted to Mirandize him at the outset of the conversation, only to be interrupted by his freely given admission. This is not the kind of "compulsory self-incrimination" that <u>Miranda</u>'s safeguards were designed to protect against. <u>See</u> <u>Michigan v. Tucker</u>, 417 U.S. 433, 444, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (stating that Miranda's "procedural safeguards [are] measures to insure that the right against compulsory self-incrimination [is] protected."); <u>see also</u> <u>Chavez v. Martinez</u>, 538 U.S. 760, 772, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) ("We have likewise established the <u>Miranda</u> exclusionary rule as a prophylactic measure to prevent ... the admission into evidence in criminal cases of confessions obtained through coercive custodial questioning.") (emphasis added); <u>New York v. Quarles</u>, 467 U.S. 649, 686, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (Marshall, J., dissenting) ("All the Fifth Amendment forbids is the introduction of coerced statements at trial.") (emphasis added). The rule that Jones would have us follow would give any suspect the ability to immunize himself entirely by making incriminating statements before the officers could fully advise him of his rights. Neither precedent nor the Constitution require such a rule.

<u>Id.</u>

Here, the evidence demonstrates that Agent Kaufmann began the process of reading to Thompson his <u>Miranda</u> rights, and that Thompson not only stopped Agent Kaufmann from completing this reading, but stated that he understood his rights and had heard them many times before.  No evidence was presented at the hearing to suggest that Thompson was forced to speak with Agent Kaufmann after Thompson stopped the reading of his <u>Miranda</u> rights, or that Thompson was threatened or promised anything in exchange for talking with Agent Kaufmann. Instead, the record establishes that Thompson, after admitting his awareness of his rights, freely and without coercion, made incriminating statements to Agent Kaufmann.

In sum, although Thompson did not expressly waive, verbally or in writing, his right to remain silent, the totality of the circumstances establishes that he impliedly waived that right when he spoke to Agent Kaufmann after acknowledging and stating he understood his rights.   Agent Kaufmann's testimony that Thompson's attitude during the conversation was cocky and boastful further demonstrates that Thompson was not coerced into communicating with Agent Kaufmann, but rather engaged in the conversation of his own free will.  As such, this Court finds that Thompson's <u>Miranda</u> waiver was voluntary, knowing and intelligent.

This Court sees no basis in the record to support suppression of Thompson's statements to Agent Kaufmann. Finding no constitutional infirmity, Thompson's motion to suppress statements should be denied.[7]

### C.    Motion to Dismiss Indictment Counts

Thompson asks this Court to dismiss Count III of the Indictment against him, which alleges one count of Unlawful Possession of a Firearm, on or about April 1, 2005, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). Thompson bases this motion on grounds that he failed to commit an offense against the United States and that the charge contained in Count III of the indictment exceeds Congress' power to pass criminal statutes as limited by Article I of the Constitution of the United States of America.

In response, the Government asserts that Thompson did not cite specific law or facts to support his motion and moves that Thompson's motion be dismissed for vagueness and lack of specificity.

---

[7]    The Government argues that even if Thompson's statements were taken in violation of Miranda, they were voluntary. It is true that statements taken in violation of Miranda are admissible, and may be used for impeachment purposes on cross-examination, if the statements were voluntarily made. See Oregon v. Elstad, 470 U.S. 298, 307 (1985) (concluding that "[d]espite the fact that patently voluntary statements taken in violation of Miranda must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination" (citing Harris v. New York, 401 U.S. 222 (1971)) (emphasis in original); see also United States v. Villalba-Alvarado, 345 F.3d 1007, 1020 (8th Cir. 2003). "In determining voluntariness, we examine whether, in light of the totality of the circumstances, the pressures exerted by the authorities overwhelmed the defendant's will. Coercive police activity is a necessary predicate to finding that a confession is not voluntary in the constitutional sense." United States v. Robinson, 20 F.3d 320 (8th Cir. 1994) (citations omitted). However, here the Government is not seeking to limit its use of Thompson's statements to solely cross-examination.

"A motion must state the grounds on which it is based and the relief or order sought." Fed. R. Crim. P. 47. Thompson did not file a memorandum in support of his motion and did not cite law or facts to support this motion. This Court has no information on which to entertain Thompson's motion. Having failed to provide this Court with any basis for his motion, the Court recommends that Thompson's Motion to Dismiss Indictment Counts be denied.

**D.   Motion to Dismiss for Statutory Speedy Trial Violation**

On May 3, 2005, an Indictment was returned against defendant Thompson charging him with one count of Armed Bank Robbery, on or about April 1, 2005, in violation of 18 U.S.C. § 2113(a) and (d), one count of Use of a Firearm During a Crime of Violence, on or about April 1, 2005, in violation of 18 U.S.C. § 924(c), and one count of Unlawful Possession of a Firearm, on or about April 1, 2005, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1).

Thompson moved this Court to dismiss the Indictment on grounds that it was returned more than 30 days after his arrest.

In response, the Government asserts that Thompson was arrested on April 1, 2005. However, at Thompson's initial appearance that same day, the Government moved for Thompson's detention. The Court conducted a detention and preliminary hearing on April 6, 2005 and Thompson was ordered detained. The Government argues that Thompson's Speedy Trial calculations were tolled during the time between his arrest and initial appearance and his detention and preliminary hearing. Therefore, the Government argues that Thompson's indictment on May 3, 2005 was within the statutory 30-day period.

According to 18 U.S.C. § 3161(b), an indictment shall be filed within 30 days from the date an individual was arrested.  However, 18 U.S.C. § 3161(h) provides for periods of "excusable delay" that extend the 30-day filing period of an indictment.  These provisions provide, in pertinent part, as follows:

> (b) Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.
>
> * * *
>
> (h) The following periods of delay shall be excluded in computing the time within which an information or an indictment must be filed, or in computing the time within which the trial of any such offense must commence:
>
> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—
>
> * * *
>
> (F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

18 U.S.C. § 3161(b), (h).

The Eighth Circuit has found that "the government's motion for detention is a pretrial motion within the meaning of section 3161(h)(1)(F)."  United States v. Moses, 15 F.3d 774, 777 (8th Cir.1994).  Further, "the period of excludable delay resulting from the government's motion includes both the date on which the motion was filed and the date on which the motion was decided."  Id.

In this case, excluding the period from April 1, 2005, when the Government filed the motion for detention, until April 6, 2005, when this Court granted the motion, less than thirty days elapsed between Thompson's arrest

and indictment, which occurred on May 3, 2005. Therefore, this Court recommends that Thompson's Motion to Dismiss for Statutory Speedy Trial Violation be denied.

III.    **RECOMMENDATION**

For the reasons set forth above, it is recommended that:

1.    Defendant Clyde Scott Thompson's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 22] be **DENIED.**

2.    Defendant Clyde Scott Thompson's Motion to Suppress Statements, Admissions, and Answers [Docket No. 24] be **DENIED.**

3.    Defendant Clyde Scott Thompson's Motion to Dismiss Indictment Counts [Docket No. 26] be **DENIED.**

4.    Defendant Clyde Scott Thompson's Motion to Dismiss for Statutory Speedy Trial Violation [Docket No. 29] be **DENIED.**


Dated:    July 1, 2005


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **July 12, 2004** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **July 12, 2004**.